Please be seated, and good morning everyone. Welcome. Our first case for argument this morning is Yoram Kahn v. Walmart. Mr. Bernstein. Good morning, Your Honor. May it please the Court. My name is Stanley Bernstein for the Plaintiff Appellant. Happy to be in Illinois this morning. ICFA, as Your Honors know, is intended to eradicate all forms of deceptive and unfair business practices. And it's to be liberally construed to effectuate that purpose. ICFA prohibits misrepresentations or any conduct likely to confuse consumers. What does Plaintiff allege? That Walmart, the largest retailer in the world, has a widespread, pervasive company-wide practice of posting lower prices on its shelf than it charges at checkout. And Mr. Bernstein, what is the factual allegations under which you base that statement, that Walmart is engaged in a company-wide pervasive and continuous false advertising campaign? The complaint details specific purchases by the plaintiff for purchases that were overpriced. The complaint details similar purchases in six states. The complaint details fines that Walmart has paid in two states for violating the posting requirement. And the complaint also details, to add insult to injury, that we went back to some of the same stores that Walmart has been fined for this practice. And the same thing happened. So one of the cases that you cite is, I think, Lee v. Kohls, right? Where a case that alleged similar kind of pervasive conduct. But in that case, they had basically a consultant or an expert do kind of a systematic statistical analysis over time that was a bit more rigorous. And I'm wondering what sort of selection process that did you go through as you're going to these Walmart stores? Were they randomly selected? Were there statistical evidence done? Because right now, what the complaint seems to allege are just kind of individual cases. And there's nothing about what sort of selection process it was, whether it was randomized or whether it was selected. Your Honor, we're on a motion to dismiss. We've alleged it's a pervasive practice. We believe we've alleged it. Well, you've alleged it's a pervasive practice, but you have – but that's why I'm asking, what is – can you give me – that seems a bit conclusory to say it's pervasive. My question is, what other – is there – and what are the best facts that you've alleged that would indicate that, that would support that allegation? We send shoppers into stores, other shoppers into stores, randomly purchased items, and we find this practice over and over again. The confirmation of the practice, to be quite blunt, Your Honor, was in the amicus brief from the Retail Federation. They confirmed for us, and the National Retail Federation is chaired by the president and CEO of Walmart, something that wasn't in their brief that we learned later. But they confirmed that this is their practice. Their practice is to change the prices in the computers before they change them on the shelf. And when they get around to changing them on the shelf, the shelf price is correct. So to answer – I think that probably is – you don't need a statistical analysis. They have told us that 100 percent of the prices are wrong until the shelf price gets changed because they change the computer prices first. They don't have to do it that way. They can do it, as we say in our reply brief, the other way around, change the shelf price. They have so many computers at Walmart and so many scanners and so much technology, confirm the shelf price is accurate, and then change the computer price. Well, I guess along similar lines, if I might, you're invoking jurisdiction, the court's jurisdiction under CAFA, right? And so one of the requirements is that the jurisdictional amount has to exceed $5 million. As I read the complaint, at least for your class – your putative class representative, Mr. Kahn, I believe he was overcharged in total about $1.89. With regard to numerosity, your complaint alleges that there's hundreds of thousands of customers, right? Well, hundreds of thousands times 1.86 doesn't really get you to the $5 million mark. And so I'm wondering, again, kind of what the basis for the good faith allegation is that you have an amount in controversy over $5 million. Thank you so much for asking. If only 2% of Walmart's products are overpriced, which is something that my friends at Walmart think is acceptable, only 2% of our products are overpriced. And if they're only overpriced by 5%, which is a very, very modest, modest overprice, because typically this happens when the prices get raised, and prices get raised 5%, 10%, 15%. The math works out with a company that does $400 billion of sales per year to be a windfall to Walmart of $400 million per year taken from consumers and given to Walmart just on overpricing. And our experience is 2% is a low number, and 5% is a low number. But as far as reaching the jurisdictional threshold, this, we think, is quite, quite easily done. And, of course, that would be a class certification issue and a jurisdiction issue, but the math works out like that. And I've used very conservative numbers in that example. It took me a while to do the math, too, because my calculator doesn't have enough zeros for Walmart sales. But you rip off consumers $1 at a time, $1 at a time, $1 at a time, and you're Walmart? You get there real fast. These are classical violations, we believe. Walmart's been repeatedly fined for this, and it doesn't change the practice. And as I mentioned, it is so easy to change that practice. There are electronic shelf registers that could be done. They have a scanner they can scan when the label is changed. But they don't do it. Why are we here? Because the district court erred, we submit respectfully, by misinterpreting ICFA, misinterpreting the cases decided by this court and the Illinois Supreme Court and the Illinois Circuit Court, to hold that simply providing a receipt after a purchase negates the deception before the purchase. We argue that's wrong. And perhaps, more importantly, with a little bit of humble witness, the Illinois Attorney General has put in an amicus brief that says that this decision is antithetical to ICFA. Bernstein, do you agree that you're seeking a form of strict liability under the Illinois statute? It's not really strict. Where it's essentially as long as Walmart intends for consumers to rely on the prices marked on the shelves. And there's a discrepancy in their favor. That's a violation. Our case is not a strict liability case because we claim they know what they're doing. But there are defenses. The question is whether you have to prove that under the ICFA. We have to prove that they intend for us to rely on the prices. Exactly. And look at the totality of the circumstances. We've alleged that they intend for us to rely on prices. Otherwise, why would they put the prices on the shelf? Why would it be required by law? Why don't they just say, pick up an item, and when you check out, you'll find out? So how is this different from strict liability? There are defenses because, theoretically, they could establish a policy that you don't rely on the prices. They warn you, like in the Tudor case, which we might get into. I'm watching my time very carefully. Unfortunately, all the preparation doesn't prepare you. In Tudor, they told the customers, basically, back in the 1990s when scanners were new, don't rely on the prices as a practical matter. The scanners may be wrong. If we're wrong, we'll give you the item for free. So it would not be strict liability. Okay. And then one of the questions I had is, what does your unjust enrichment claim add to your case here? I thought that question might come up. It rises and falls with ICFA. It gives you restitution. It gives you restitution, so perhaps a different remedy than under ICFA. What's your remedy under the statute? The statute, they overlap. They do overlap, Your Honor. I'm just wondering whether they aren't completely congruent. We're asking for restitution. We're asking for corrective action, injunctive relief, but they do overlap. So, you know, ICFA prohibits any misrepresentation or any act that would lead to a likelihood of confusion. Putting a shelf price up that says $1 and you charge $1.10 is likely to confuse most consumers. Do you see any difference, Mr. Bernstein, between a minor discrepancy of a few cents, let's say, on a tube of toothpaste and, let's say, a $100 discrepancy on the price of a television in terms of reliance, susceptibility to deception, and so on? Honestly, no. If they put up a price tag that they intend for us to rely on and then they change that price secretly and don't tell the consumer, that is a deceptive practice. These are not innocent errors by one clerk, which our friends at Walmart would like you to think. This is the plan. This is in the amicus brief. They've confessed. We allege there was pervasive practice. Your Honor asked me specifically, was it just random? Was it just six states? So far, we have evidence from six states. I thought that was enough to allege. This was not a 9b motion. This was just a 12b6 motion where the court just said, a receipt voids everything, and that's really why we're here, and that cannot be the law. But a $100 discrepancy in Judge Hamilton's hypothetical would more readily be noticed by the consumer at the time of checkout when the receipt comes up, right? So it's harder to call that deception than minor errors such as those that are alleged here. It depends, Your Honor, on what the price was. That would be overlooked by the consumer until later. It depends what the price of the item is. If the item was a $2,200 TV set and you checked out and it was $2,300, you might not notice. Consumers, the lawyers, do not have to audit their receipts. I think the point is that this is contextual. We can't apply the fraud component of the statutory claim without some factual allegations suggestive of fraud, deception, and intent to deceive, or not intent to deceive, but intent that the consumer rely on the mispricing on the shelf. And that means something more than just the price discrepancy itself. It's the price discrepancy plus some other facts, whether it's the receipt and all of the other facts that were in the Tudor case. It was not just a receipt in the Tudor case. It was the money back, not just the money back guarantee, but the item for free guarantee. Item for free, yes. Which went beyond a refund. But the other facts that were present in the Tudor case took that case outside of what could reasonably be called an adequate pleading of fraud. And we have to get beyond, you know, we're not a plausibility standard. If the evidence or if the allegations, excuse me, are in equipoise and they're as easily interpreted as inadvertent random price discrepancies as they are interpreted as fraud, then dismissal was appropriate. But you've got to point us to the plus factors. The plus factor here, Your Honor, is we've alleged a pervasive practice that they have confessed in the amicus brief is the practice at Walmart and others that they change the prices, I'll say on Saturday night in the computer system, and they get around to changing the prices on the shelf whenever they get around to it. So they put the lower prices in the night before. And then they change the shelf pricing to reflect the lower price. The higher price. They put the higher price in the night before. When they raise their prices, they raise their prices, but they leave the lower shelf price on the shelf indefinitely. So they don't input the sale price the night before. They don't put the sale. I'm talking about prices going up. Sale prices, oh, they're quick on changing the shelf to advertise a sale because they want to encourage you to buy a sale price. It's when the price goes up is essentially when the consumer gets damaged because they charge you more at checkout. Now, I have six minutes left, which I wanted to reserve for rebuttal. I do want to make it. Can I ask you one thing, Mr. Bernstein, if I may, along what Chief Judge Sykes was asking about the context, the factual context? Do you know whether the Walmarts that are mentioned in your complaint had point-of-sale register displays? I don't know. That was something raised for the first time in the reply brief. The point-of-sale register display might go into the totality of information that's available to the consumer. But Walmart, unlike Tudor, does not tell you don't rely on the shelf. No, no, no, but I'm just wondering whether or not you know as a factual matter whether the Walmarts had such displays. I don't know. Or whether they were legally required to have such displays in these states. I don't know. I don't know. I do know this, that the legislature in ICFA Section 11A says this act shall be liberally construed to affect the purposes thereof, to eradicate all forms of consumer deception. The Illinois Supreme Court in Olivieri and Robinson said ICFA should be utilized to the utmost degree to eradicate all forms of deceptive and unfair business practices. It is unfair to change the price on the computer, raise the price on the computer, and leave the consumer not aware of that price change. And as a practical matter in this court, in many cases in Bell v. Publix and all the cases we cite, Bell v. Publix and Benson v. Henry May and Vanson v. Hills, some of them didn't even have a specific misrepresentation. Some of them had confounding information. The truth was on one side. The falsehood was on the other side of the same package. And this court held that that was potentially deceptive, was deceptive under ICFA. Here we have the exact information being a falsehood. The shelf says $1, and you check out, it'll be $1.20. That is a violation of ICFA under Bell v. Publix and Benson v. Henry May and Vanson v. Hills and Kim v. Corders. Kim v. Corders, the Seventh Circuit ruled, that's just saying what a suggested price would be was a violation of ICFA, even though the consumer was paying the actual price that was advertised. Here we're not paying the actual price that's advertised. So this is only a motion to dismiss. I have about three minutes left, but I ask your Honor to consider the following example, which I believe is in our brief. You're driving down the highway, and you see an advertisement at a shelf station. It says $3.09 a gallon. You drive in there. You fill up your car. You go home. You look at the receipt from the glove compartment, and it says $3.29 a gallon. That is deceptive. And that's about the point of sale. Maybe the $3.29 was on the fine print. It's deceptive even if I notice the price as I'm pumping, right, because I've taken the time to pull off the highway, and I don't want to look around for another gas station. That is one of the pieces. We're talking here about sunk costs, search costs, and so on from what behavioral economics tells us. Absolutely. Absolutely. And this Court has said consumers shouldn't have to do these things. And Walmart doesn't have to do it. But I have $2.45 left. I'd love to reserve that time, please. That's fine. Thank you. Mr. Bluin? Yes. Good morning. May it please the Court. This case centers around plaintiff's contention that an inaccurate shelf price is per se unlawful. Those are not my words, Your Honors. Those exact words are set forth not once but twice in the plaintiff's brief. That's the underlying point that they're trying to make throughout this entire lawsuit, is even in a simple situation where an honest mistake is made, my client should be held liable. And it's not just for a dollar's worth. Is that what they're saying? Or are they saying that based on that allegation they should be able to survive a motion to dismiss? Those are two very different things, right? Because certainly, as we all know, the totality of the circumstances and the context matters. But plaintiffs aren't obligated to allege all of those factual contexts that might harm their case and their complaint. They're only obligated to allege enough where, taking all inferences in their favor, we think they might be able to state a claim in some plausible manner. Very true, Your Honor. And if I could, and I'll go back, answer that question, and simultaneously answer the question that you proffered to Mr. Bernstein. Let's look at the facts that are specifically alleged in the complaint. What we have here is this individual. I think it's clear. It's certainly reasonable to infer that when he went to Wal-Mart on August 2nd, he wasn't shopping for muffins or donuts. He was shopping for a lawsuit. That is fairly clear, I think, and it's not a leap of faith to reach that conclusion. He was a tester. He was a tester, Your Honor, and so much so that immediately before or immediately after he left Wal-Mart, he walked down the street literally on Toohey Avenue to Target and did the same thing and filed an identical lawsuit against Target. So he was seeking discrepancies here. He was seeking mistakes. I don't think that can be credibly disputed. Now, with that as the factual backdrop, what did he find? He allegedly found six items. Your Honors, I don't know if any of you have been in a Wal-Mart. I'm guessing you probably have at some point, but I think it's safe to assume that there are hundreds, at least 100,000, 150,000 different items at any Wal-Mart store at any point in time. So that's our frame of reference. Let's be conservative and say 100,000. What did this tester, the plaintiff, find when he was shopping for this lawsuit? He found six items, six out of 100,000. Equally important. But you can't test until you actually go to the cashier, right? I disagree, Your Honor, and here's why. I forgot, one of Your Honors raised the point about the point of sale system. Yes, I believe, Judge Lee, you were the one that asked the question. Yes, Wal-Mart has those systems in place, and, yes, they're required to have those systems in place, certainly in Illinois. I can't stand before Your Honors and tell you I know the laws in all 50 states in that regard, but in Illinois, I can tell you that, and a specific statutory site is set forth in our brief. Meaning you can scan and see what the scanner price is. Exactly, Your Honor, before there is a sale that's consummated. Before the receipt is printed, you scan it if you're at the self-checkout or the cashier scans the item and the price comes up. So if there is a discrepancy, whether it's the $100 discrepancy for the TV that was referenced or the dollar discrepancy or the 42-cent discrepancy for the muffins or cupcakes, you have an opportunity to identify that discrepancy before you hand over the cash or your credit card. And if the consumer is actually monitoring that, right? And we also have retailers invest an awful lot of money into researching actual consumer behavior, right? Correct. And every cashier I've ever been around, I'm surrounded by impulse items, right? Candy, gum, magazines, distractions, the latest celebrity, divorce, and so on. Everything to distract me from paying attention to whether the scan prices match what I saw and might remember. True, Your Honor. I guess hypothetically I will tell you I understand the point. Well, part of the question, what I'm really getting at, is the question whether in applying these consumer protection statutes, we should be focusing on Adam Smith's rational economic actor or actual consumer behavior. Your Honor, first of all, with respect, there are no such allegations in the complaint, which is what we're talking about here today. No, but that's a responsive theory to your insistence that a receipt washes away all potential for deception. Your Honor, first of all, we haven't taken a position that a receipt, in and of itself, absolutely is dispositive here. It is a factor. It's a clearly important factor, as the Illinois Supreme Court said 25 years ago in the Tudor case. We are not saying that the receipt, in and of itself, is dispositive. We are saying that it is a highly significant factor. The totality of the circumstances is the appropriate test here. We cited numerous cases. My opponent cited numerous cases. There's no dispute about that. What's Walmart's policy on price discrepancies? There's a variety of policies that apply. First of all, Your Honor, Walmart has a total refund policy, I believe, off the top of my head. It's a 90-day. I think it's a 90-day, 30 or 90 days, no questions asked, absolute refund in place. And what's the state of the record on that? There's nothing in the record at this point. There were no allegations in the complaint specifically addressing that.  So there is a refund policy in place. There's a price match policy in place. Internally, the company has practices that if a price discrepancy is brought to an employee's attention, that employee is supposed to address it right then and there, no questions asked. So that's the response to that specific question. But going back . . . Go ahead. I was going to say going back, and Judge Lee, to your question earlier about what are the facts here. We have one plaintiff going to one store and he finds six items out of the 100,000 plus items. What didn't he or any of the other testers do? They never went back to the Walmart store in Niles, Illinois. They didn't show this was repetitive at that store. All we know is there were six items on one day at one store. That's all the plaintiff himself did. Now, let's talk about some of the other allegations in the complaint because I would respectfully submit they highlight my point. They support my point, which is this situation is nothing other than a simple mistake. It could be caused by multiple reasons. I have a couple hypotheticals I'm happy to share with you. But it is a simple mistake. There is no factual support for any reasonable inference that this is anything other than a mistake. Contrary to the conclusion . . . Could you address what plaintiff has talked about with . . . 2% looks like it's acceptable within the industry or at least tolerated within the industry. We have the prior enforcement actions, fines, etc. We have the amicus brief saying, in essence, all this is unavoidable. It may or may not be unavoidable, but that would seem to be beyond the motion to dismiss stage. Possibly, Your Honor, but let me address what is in the complaint and highlight why it's insufficient, which is I would submit what we're talking about here and why the district court appropriately concluded that the allegations in the complaint were insufficient to satisfy the requisite elements of the stated claims. So, the facts in the complaint. Plaintiff himself purchases six items that apparently had a mistake. One day, one store, one state. That's it. That's all we have for the plaintiff. With regard to the plaintiff's counsel, let's see what they found. Maryland, one product. One day, one store, one product. Pennsylvania, one store, one day, two products. Again, let's keep the context in mind here because contextual analysis is appropriate, as Judge Sykes earlier noted. So, context, two products in Pennsylvania, four products in Florida. We're getting into big numbers now. Six products in New Jersey. That's two different stores. Mr. Bloom, I guess, you know, we've all read the complaint and we know what the allegations are in the complaint. The question that really kind of comes to mind is that it's a multi-factor test, right, as far as you look at the totality of circumstances. But certainly one is that Walmart does intend for its customers to look at the prices on the shelves and to rely on them to some extent. Now, to what extent, that's in dispute, but certainly that's why the prices are there, right? Otherwise, they wouldn't need the prices there. And, as I noted, plaintiff does not have any obligations to include what I might call exculpatory allegations. And so given that's the state of the law in Illinois under the ICFA, why isn't that enough to get them passed the motion to dismiss? Now, and going back to what Judge Hamilton said about or the example about the big screen TV versus the small various items and what a reasonable consumer might do, again, to me, why isn't that a factual issue that needs to be resolved after some discovery and perhaps at the summary judgment stage but not at the motion to dismiss stage? A couple of points, Your Honor. First of all, with regard to the discovery, I don't think there's any dispute that Rule 9b specificity requirements apply here given the fraud-based allegations. Actually, that is an issue given the ICFA and the allegations of just unfair practices. I stand corrected, Your Honor. I agree with your statement that to the extent there is a separate claim here for unfair, generally speaking, the unfairness prong applies to Rule 8. I will agree with that statement. However, in this context, is the district court appropriately concluded? There's claim conversion in multiple instances, and we would submit here where all of the allegations, whether deceptive or unfair, rely on an underlying allegation of fraud. In those types of situations, 9b applies. Well, sorry, I need to pursue this for a moment, and I'll ask you to go back. But it seems to me relevant in this context would be the hypothetical about and not so hypothetical since it happened to me on Monday on my way to Chicago, seeing an advertised price for gas pulling off the highway, and there's a different price at the pump. Hard to call that fraud, right? I mean, the actual price is disclosed to me at the pump, and I have to make a choice then. Do I go ahead and pay the extra that was not disclosed to me, or do I drive on and search for another gas station? Do you think that's actionable? First of all, with regard to the specific gas example, Your Honor, my understanding is gas pricing is subject to federal regulations. I am not an expert, and I don't know, so I can't address that specific situation. Just assume, apply the standards of the ICFA to that fact context. Again, it's difficult to do without more information. How is it different from this? Here's why, Your Honor, and this is where I was going with this a minute ago. For the unfairness prong, the law is very clear that there need to be sufficient factual allegations to establish the unfairness aspect of the claim asserted. Oppressiveness is one. In Tudor, for example, again, 25-year-old Illinois public worker. Gas station is easy. It's easily oppressive. You pull strangers off the highway by advertising a false price and then confront them with the choice of a higher price. Again, Your Honor, that may or may not be. I'll concede that there could be hypothetical situations. If you're out in the middle of a country and that's the only price. Sure. How different is this, though, from, let's say, you've got a basket full of items at a Walmart cash register and you've got five people in line behind you. Kids are impatient. Maybe they're crying. You're going to stop and audit. Do you know anybody who stops and audits their receipts? Your Honor, I will tell you I've actually seen that happen where people will question. Yes, I have. Have I personally done it? What's the reaction by the people behind them? We can only imagine. You think Walmart knows how that works? Your Honor, I can't answer that question. Is there any better informed retailer in the country? I don't know the answer to that. I'd be surprised. I would be surprised, but I don't know the specific answer to your question. But, again, the issue with it, the issue presented here is whether there are sufficient facts taken in totality, taken in the context, to establish that this was a deceptive act and in addition to that, that the requisite element of intent was sufficiently pled. We respectfully submit that the plaintiffs have failed their burden in that regard. All they have, going back to Judge Lee, your question about statistical analysis and what's the total set here, I'll cut to the chase. If you look at all the allegations in the complaint, they found a total of 31 items during an 8-month investigation, 11 different stores, multiple different states, 11. I'm sorry, 31. Now, they're going to say, well, Mr. Blunt's conveniently ignoring the other regulatory investigations. I want to address that as well. First of all, North Carolina is one of the two that they identify in their complaint. I want to talk about North Carolina. First and foremost, it's interesting to me that they highlight North Carolina because, Your Honors, if you look at footnotes 13 and 14 of the complaint in which the plaintiffs identify the other states that are included in the multi-state consumer fraud claims, noticeably absent is North Carolina. So even they don't believe that North Carolina is relevant, but here they are relying on a North Carolina investigation. That strikes me as curious. Secondly, with regard to North Carolina, that investigation clearly showed that the issues identified by the North Carolina regulators were store-specific. They were not systemic. The plaintiff himself acknowledges that. If memory serves me, it was paragraph 37 of the complaint where he talks about North Carolina being store-specific problems. That's a long way away from sufficient evidence of establishing a countywide, countrywide systemic problem. So, Mr. Blumenthal, let's take another look at this case and let's assume that plaintiff was filing this case in state court and it was an individual plaintiff. No allegations of class. And Mr. Kahn says, look, I went into Walmart. I bought these six things. The prices were wrong. I paid more for them. I went home, and it wasn't until I got home I was able to look at the receipt. And so I'm going to bring an ICFA claim. Are you saying that that claim would not be able to survive a motion to dismiss standard? I am saying that, Your Honor. Given that limited set of facts, if that's all we have, there's no context within which to support a reasonable inference that... Well, then what more would Mr. Kahn in that situation have to allege on the ICFA? I can't speculate as to what would get him over the hurdle, but one thing I can say, Your Honor, is there are certain states where the burden is affirmatively placed on the consumer to bring an error to the retailer's attention. I will cite specifically Michigan, and I believe if my notes are correct, this is in our brief, but it's section 445.319 of the Michigan statute. I think it's on page 7 of our brief where we highlight a couple of different states. The reason I'm raising that is it's not unreasonable for a retailer to expect that a consumer bring to the retailer's attention if an error happens. If it's an innocent mistake, that does not warrant a fraud-based claim or even an unfairness claim under the Illinois Consumer Fraud Act. Now, back to my footnotes 13 and 14 of the plaintiff's complaint. And I just referenced, Your Honor, a Michigan statute. Clearly, we're in Illinois. But it's interesting, if you go back to that same footnote, plaintiffs say Michigan consumer fraud statute is analogous to the Illinois consumer fraud statute. So, by extrapolation, I'm arguing that Michigan acknowledges the burden is on the consumer if they find an error, a one-off error. Do you see that in Illinois law? Or are you simply trying to play off of the brief or the complaint? Your Honor, to my knowledge, there is no express provision identical to that under Illinois law. That is correct. But I would suggest that Illinois law is consistent with Michigan. And again, I'll direct the court's attention back to the Tudor decision, which is the only Illinois appellate court authority directly on point here. Yes, there are two circuit court cases, the Gohari case and the Gansberg case. We've addressed those in a brief. I'm happy to address them further if you have any questions. But Tudor is a 25-year-old Illinois... I see your time is almost up. If I could ask you a question about the point-of-sale thing again. In your brief, you cite 225 Illinois Statute 470-30 and the Administrative Code, Section 600.330. My reading of those provisions is that Illinois basically adopts the National Institute of Standards and Technology handbooks, Section 130 and 44. But I don't see anything in there that mandates that point-of-sales equipment be used, only that if point-of-sale equipment is used, that it has to follow or meet the requirements of the handbook. And I'm just trying to... Is it your understanding of those provisions that that mandates point-of-sale displays? Your Honor, I appreciate the distinction in your question. Candidly, I would have to dig into that further. I truly don't know. I can tell you unequivocally, without hesitation, that Walmart absolutely has those point-of-sale screens, if you will, at checkout. The district judge dismissed the claim under the Uniform Deceptive Trade Practices Act, the injunctive claim, on the merits for lack of adequate allegations of a deceptive act for the same reason as the ICFA claim was dismissed. But there's an additional issue that's been raised about the imminence of any harm to this plaintiff... Yes, Your Honor. ...to support the claim for injunctive relief. Yes, Your Honor. There's two points here, and I see my time is over, but I'll be happy to answer your question. First of all, you're correct. The district court dismissed the Uniform Deceptive Trade Practices Act in part because there was insufficient allegations of deception, which is one of the requisite elements under that statute. In addition, and I believe we addressed this in our reply brief in the district court, that to state a claim under the Uniform Deceptive Trade Practices Act, you can't get damages under that statute, as Your Honor probably knows, but the plaintiff must allege sufficient facts that he or she... There's a likelihood of harm in the future. There's multiple cases. Robinson case, I think it was Benson, these are all cited in our brief, that stands for the proposition that once a plaintiff is aware of a situation like prices might not always match, that they're put on notice, and therefore there's no risk of future harm. I would submit that's exactly applicable here. The named plaintiff, who clearly was shopping for this lawsuit and others, clearly now at a minimum should be on notice that if he's going back to a Walmart store, if he thinks there's a problem, he should look at the screen at the checkout so there's no risk of future harm. Is this a merits question about the adequacy of the allegations or a question of standing? Injury. To support future injury, imminent future injury to support an injunctive relief or prospective relief claim. I would have to think about that again. I know damages are not an element under that statute, and how exactly procedurally... Well, if it's a standing question... It's a lack of factual allegations in the complaint to meet that requisite element under the Uniform Deceptive Trade Practices Act, I guess is how I would answer that question. And the recovery of attorney's fees under that statute is sort of the tail wagging the dog there, presumably? Presumably, Your Honor. Okay. Got it. Thank you. With that, I see my time has expired. If there's no other questions, I respectfully ask this Court to affirm the District Court's order dismissing plaintiff's complaint in its entirety. Thank you. Thank you. Mr. Bernstein. I have 240. I'm going to use my New York Minute to cover six, seven points, and hopefully there'll be a tape and notes. Judge Hamilton asked how real consumers behave. That is the test under Bell v. Publix. Real consumers don't remember the price at the shelf in a Walmart. I can't even find the aisle that I was in if I... Again, I certainly can't find the price, and they're not required to. Many consumers don't notice the false price when it gets rung up, if they happen to be looking at the scanner, and even when they get home. And those people are entitled to their money back, and hundreds of thousands of people or millions can't go to the customer service desk and ask for that money back, and certainly not if they don't know they weren't overcharged. And the law is very clear in the state courts with several decisions. Consumers are not required to audit their receipts, and that's what my friends at Walmart are telling us to do. As far as misrepresentations, can an innocent misrepresentation violate ICFA? That, I think, was the question this morning. The answer in our brief and in the Attorney General's brief is yes. The Illinois Supreme Court in Lesley said that an innocent misrepresentation... Duran v. Lesley said an innocent misrepresentation can violate ICFA. Walmart intends... Under an unfair practice theory or under a deceptive practice theory? A deceptive practice, I believe, is the case. That's not our case. We claim it's not an innocent misrepresentation. I'm trying my... Hour 15. Hour 13 to finish. A tutor, my friend Mr. Bluen mistakenly referred to at one time as an Illinois Supreme Court case. It's not the Supreme Court. It's obviously the appellate court, but she referred to it later. This court has held the receipt does not cure a... Deception. That's Fannie Mae. And in state court Gansburg v. Kroger, which is very similar facts to ours, that circuit court held, the shelf prices rejected all the arguments that Mr. Bluen made at circuit court very recently, several months ago in a supermarket. Judge Lefkoe held that the refund option does not obviate pre-sale deception, and that was in the Comasta v. Omaha stakes case. And Judge Hamilton referred to the time and the gas station and driving around, a case not cited by us, but it brought... Your Honor's question reminded me of FTC v. thinking achievement by this very court. There's a time factor. And Walmart is imposing on me now if we take everything they say, I should audit, remember the price from the shelf, remember this, remember that, and finally national weight of measures, standards, the 2% allowances before you get fined. The footnote 8 in the very same statement says, but consumers are always entitled to a refund for an overcharge. We won't fine you if we don't fine more than 2%. But you have to get back the money. That's what we're here. Paragraph 37 of our complaint about North Carolina, Mr. Bluen read half the sentence. There were store-specific fines. The rest of the sentence says there was a $2 million statewide fine to go to pervasiveness. So, you know, we think... And for the injunctive relief, the very last point I'm going to make, I know I'm going over, I do apologize. The consumer knows there may be an overcharge. The cases cited by Walmart is where we're talking about a specific product, and you know that that specific product does not contain 100% natural ingredients. The cases are... There are several cases that say if you just know that some products may be overpriced, you don't know which, that you are still...you have a viable IFRA claim. And for that, I would point to the Gansberg case and the Gohari case, both circuit court cases, and actually Levy Calls, which was brought up this morning by Judge Lee. It's a motion to dismiss. Inferences should be granted in our favor. We think we've said everything we needed to do. If there was something else, you know, we'd be happy to. You know, the story gets better and better, but this is a pleading stage. We urge a reversal. And the attorney general put in an amicus brief that said that this situation is antithetical to IFRA. All right. Thank you very much. Thank you so much, Your Honor. Our thanks to all counsel. The case is taken under advisement.